IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM LILLEY,

    Plaintiff,

vs.                                                                                Civ. No. 17-515 KG/JHR

CVS HEALTH, CVS PHARMACY,
CVS CAREMARK, and JOHN DOES 1-4,

    Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant CVS Pharmacy, Inc.'s "Defendant's Motion to Strike Expert Witness" (Motion to Strike), filed July 26, 2018, in which Defendant CVS Pharmacy, Inc. (CVS) moves to strike Plaintiff's liability expert witness, Elizabeth Thomson. (Doc. 60). On August 9, 2018, CVS filed a "Notice of Errata Substituting Exhibit" (Notice of Errata). (Doc. 65). Plaintiff filed a response on August 24, 2018, and CVS filed a reply on September 7, 2018. (Docs. 67 and 72). Having considered the Motion to Strike, the Notice of Errata, and the briefing, the Court grants the Motion to Strike.

*A. Background*

On May 1, 2014, just prior to midnight, a carjacker shot Plaintiff in the parking lot of an Albuquerque CVS pharmacy store. Plaintiff alleges that the CVS exterior cameras did not detect the incident and that the parking lot was dangerous "well before the incident date." (Doc. 1-1) at ¶¶ 17 and 19. Plaintiff asserts that Defendants acted in a negligent manner by breaching "a duty to use reasonable efforts to make the Location, which includes the parking lot, safe for business patrons by providing enough security to protect Plaintiff against the foreseeable acts of third persons." *Id.* at ¶ 24.

*1. Thomson's Expert Report*

The Court set a December 7, 2017, deadline for Plaintiff to disclose his experts. (Doc. 18). On December 8, 2017, Plaintiff filed a notice disclosing his liability expert witness, Elizabeth Thomson. Thomson is a crime prevention consultant, former Albuquerque Police Department (APD) sergeant, Crime Free Multi-Housing instructor, and a former residential property manager and owner. (Doc. 31); (Doc. 60-2) at 7; (Doc. 60-3) at 1-4.

Thomson opined in her December 7, 2017, expert report that (1) the criminal history at the CVS store produced a "dangerous condition" which created "a foreseeable risk of injury" to Plaintiff; (2) Plaintiff could not have determined that the parking lot was in a dangerous condition when he arrived at the store on the night of the incident; (3) CVS acted unreasonably by not requiring employees "to report dangerous crimes in the parking lot to management;" and (4) CVS could have taken eleven "reasonable" measures which would have protected Plaintiff from harm. (Doc. 60-1) at 1-3.

One such measure, for example, required that CVS create a formal line of communication between store employees and management to keep management apprised of "all crimes committed inside and outside the store (parking lot) in order to detect any patterns of criminal activity." *Id.* at 2. Another measure required that CVS install "legible, easily visible, well-lit exterior signs indicating that the store is under 24 hour surveillance and subject to routine police patrols and/or bait vehicles." *Id.* at 2. A third measure required CVS to install

> [l]egible, easily visible, well-lit exterior signs warning customers that the location and its parking lot have been subject to criminal activity and customers should remove valuables, lock their vehicles, and proceed at their own risk.

*Id.* A fourth measure required that CVS install exterior "No Trespassing" signs citing the applicable city ordinance. *Id.* at 3. Yet another measure required that CVS hire a security guard

"for dangerous periods, including dusk till dawn." *Id.* An additional measure required that CVS "add and/or position exterior surveillance cameras in such a way that the parking lot and entire perimeter can be observed by staff or off-site surveillance team…." *Id.*

To formulate her opinions, Thomson relied on

> a summary of coded calls for police service to the CVS location and police reports derived from three years of CAD [computer aided dispatch] data commencing three years prior to the incident date of May 1, 2014.

*Id*. at 1. Thomson attached to her report a list of 28 APD case numbers with corresponding incident numbers. (Doc. 72-1) at 1. She "also reviewed CVS's responses to Discovery in this case." (Doc. 60-1) at 3.

*2. Thomson's Deposition Testimony*

Thomson acknowledged in her deposition that she did not base her report on any industry standards because she understood none existed. (Doc. 60-2) at 19. Also, Thomson did not choose to examine APD CAD data for a three-year period. *Id.* Rather, Thomson was simply provided with CAD data for a three-year period. *Id.* Additionally, Thomson did not distinguish between crimes which occurred in the parking lot and those which occurred in the store. *Id.* at 23. In fact, Thomson noted that "violent crimes" are related to organized retail crime like shoplifting. *Id.* at 12.

Thomson testified that she does not use a personal or professional standard for determining if an area is a high crime or low crime area. *Id.* at 8-9. Instead, Thomson focuses on whether crime is a problem in an area.[1] *Id.* at 9. Although Thomson was aware of a standard

---

[1] Thompson testified that she does not use a standard distance from a business to determine the extent of crime surrounding the business. (Doc. 60-2) at 10. She examines an area and then "go[es] out from there." *Id.* CVS' expert agrees that a geographic limitation depends on the characteristics of the area surrounding the subject property. (Doc. 67) at 34.

methodology for determining what constitutes a high crime area and that the APD crime analysis unit adheres to standards, Thomson did not know what those APD standards are. *Id.* at 11.

Thomson recommended at her deposition that employees not only report crime to corporate managers but that employees also report the lack of crime. *Id.* at 16. Thomson did not base this recommendation on an industry standard. *Id.* Rather, she based the recommendation on "reasonable care" and her experience. *Id.*

Thomson testified that she was not aware of any data showing the efficacy of exterior signs indicating a store was under surveillance and subject to police patrols and bate vehicles. *Id.* at 24. Thomson also testified that no industry standard exists which describes a reasonable sign to warn patrons of the risk of harm. *Id.* at 26. Moreover, Thomson testified that she did not have any data or study to support the efficacy of either posting "No Trespassing" signs" citing the applicable city ordinance or installing exterior surveillance cameras. *Id.* at 27 and 28. Thomson further acknowledged that no standard exists with respect to the presence of a security guard. *Id.* at 5.

As a police sergeant, Thomson participated in the Albuquerque Retail Asset Protection Association (ARAPA). ARAPA assisted businesses, including large pharmacies like CVS, by providing crime prevention strategies based on property assessments and crime statistics. *Id.* at 3-4. Every month, Thomson and ARAPA conducted a problem-oriented policing (POP) project at a business or area with a high incidence of crime. *Id.* at 4.

A POP project required Thomson to examine data from the APD crime analysis unit. *Id.* The APD crime analysis unit engaged in predictive crime analysis and produced crime analysis maps, i.e., heat maps. *Id.* Thomson also examined the environmental design of the targeted

property to evaluate crime prevention strategies.[2] (Doc. 67) at 36. The POP program required measuring the effects of the POP projects. *Id.*

Finally, having analyzed an even "bigger data set" than she had at the time she wrote her expert report, Thomson testified that she continued to find a pattern of criminal activity at the CVS from 2009 to 2014. *Id.* at 17 and 29.

*3. Thomson's August 24, 2018, Affidavit*

In her August 24, 2018, affidavit, Thomson opined that it was "'Moderately' to 'Highly' foreseeable" that the May 1, 2014, shooting and carjacking would occur in the CVS parking lot. (Doc. 67) at 28. Thomson used the terms "moderately" to "highly" foreseeable as "defined by noted security/loss prevention/crime prevention expert Chris McGoey…." *Id.* Thomson trained under McGoey "in an educational seminar setting." *Id.*

Thomson explained that her methodology "is accepted in the fields of Loss and Crime prevention, as well as [her] training and experience in both property management and law enforcement." *Id.* Thomson's methodology consisted of first analyzing "factors known to affect foreseeability of criminal activity" such as "hours of operation," "nature of operation," and "products or services offered." *Id.* at 28-29.

Thomson next analyzed

> the historical, documented, crime occurring on and around the premises where the incident occurred, for a period of time before and after the incident in order to identify patterns, trends, and symptomatic indicators.

*Id.* at 29. Thomson based this analysis on APD CAD data which she refined by omitting calls not related to the CVS store, inspecting the generated police reports, and requesting CAD details

---

[2] Thomson testified that she believed controlling access to the CVS parking lot was a "big" issue since one could access the store from all sides. (Doc. 60-2) at 5. This access to the parking lot means that a criminal could easily escape from the CVS parking lot. *Id.* at 15.

5

for police service calls that did not result in a police report. *Id.* at 29-30. Moreover, Thomson relied on her experience as an APD police officer. *Id.* at 29.

Thomson also assessed "environmental or physical factors" of the CVS store like "access control, video cameras, landscaping, signage, ingress and egress, natural surveillance." *Id.* at 30. Thomson further requested to review CVS policies and procedures, but CVS did not provide them to her. *Id.* Thomson listed literature supporting her methodology. *Id.* at 30-31.

Finally, Thomson noted that her training and experience consisted of (1) being "a certified instructor for the Crime Free Multi-Housing program;" (2) being a former APD police officer involved in community policing and crime prevention strategies who conducted POPs and crime analysis; (3) attending Organized Retail Crime Conferences; and (4) belonging to ARAPA. *Id.* at 31-32.

B. *Discussion*

As an initial matter, CVS argues that Plaintiff cannot use the August 24, 2018, affidavit at this late stage of the litigation to "retroactively create a foundation for Ms. Thomson's opinions." (Doc. 72) at 2. CVS further argues that the Court should exclude Thomson as an expert witness under Fed. R. Civ. P. 702 and *Daubert* for the following reasons: (1) Thomson lacks specialized knowledge that would aid a jury to understand the evidence or to determine material facts; (2) Thomson failed to base her opinions on sufficient facts or data.; (3) Thomson failed to base her opinions on reliable principles or methods: and (4) Thomson did not reliably apply principles or methods to the facts of this case.

*1. Timeliness of the August 24, 2018, Affidavit*

CVS asserts Thomson cannot form the bases for her opinions "*after* the expert and her opinions are disclosed," especially at this point in the litigation. (Doc. 72) at 2. Indeed, Plaintiff

filed the August 24, 2018, affidavit well after the expert disclosure deadline of December 7, 2017, expired. *See* (Doc. 18). Essentially, CVS contends that the August 24, 2018, affidavit is an untimely expert report, not a supplement to the December 7, 2017, report that attempts to cure the deficiencies in that report. *See* Fed. R. Civ. P. 37(c)(1) (stating that if party fails to timely disclose expert testimony or to supplement expert information, "the party is not allowed to use that information … on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless"); Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring expert witness report to include "a complete statement of all opinions the witness will express and the basis and reasons for them"); Fed. R. Civ. P. 26(e) (imposing duty on expert witness to supplement report if expert witness "learns that in some material respect the disclosure … is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties").

This Court is guided by *In re Cent. European Indus. Dev. Co.* which addressed the question of whether an affidavit or declaration which tries to cure deficiencies in an initial expert report should be treated as a Rule 26(e) supplement to an initial report or as a subsequent untimely expert report. 427 B.R. 149, 157 (Bankr. N.D. Cal. 2009) (observing that if declaration is expert report then "filing an undisclosed expert report long after the deadline is an improper attempt to circumvent the expert discovery schedule established by this court"). That court explained

> [i]f the Declaration is viewed as a "supplement" setting forth information, reasoning and opinions in order to cure that part of her Report's deficiencies, Rule 26 required such things to be disclosed in her critical initial Report. "The purpose of ... supplementary disclosures is just that—... to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information."

*Id.*

The court in *Eugene Baratto, Textures, LLC v. Brushstrokes Fine Art, Inc.* explained that supplementation under Rule 26(e) "is intended to provide parties an opportunity to correct mistakes and oversights, not to include new examples and illustrations that could have been included in an original expert report." 701 F. Supp. 2d 1068, 1071 (W.D. Wis. 2010). And a court in Kansas clarified that

> [a] supplemental expert report may be excluded under Rule 37(c) [failure to disclose expert and provide expert report] if it … seeks to strengthen an opinion expressed in the original report. Rule 26(e) may not be used to provide an extension of the expert report deadline or sandbag one's opponent with issues that should have [been] included in the original report.

*Spirit Aerosystems, Inc. v. SPS Techs., LLC,* 2013 WL 6196314, at *7 (D. Kan.).

The Court determines that the August 24, 2018, affidavit goes beyond correcting a mistake or oversight, or merely supplementing Thomson's December 7, 2017, report. Instead, the affidavit sets forth a methodology and reasoning in an effort to strengthen Thomson's report and cure any deficiencies in that report. Specifically, Thomson could have included in her report the foreseeability of criminal activity factors she examined, how she viewed APD CAD data and calls for police service, her assessment of environmental or physical factors of the CVS store, and the literature she relied upon. Had Thomson included that information in her report, CVS could have deposed Thomson about her purported methodology and its application to the facts in this case. In that respect, the affidavit unfairly prejudices CVS. The Court will disregard the August 24, 2018, affidavit as an untimely expert report.

*2. Rule 702 and Daubert*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 imposes on courts a gatekeeper obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Even so, a court should liberally admit expert testimony. *See United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995) (describing Rule 702 as a "liberal standard"). The proponent of the expert testimony bears the burden of proving the requirements of Rule 702 by a preponderance of the evidence. *See* Fed. R. Evid. 702 Advisory Committee's Note (2000) ("[T]he admissibility of all expert testimony is governed by the principles of [Fed.R.Evid.] 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

> *a. Whether Thomson Lacks Specialized Knowledge that Would Aid a Jury to Understand the Evidence or to Determine Material Facts*

CVS contends that Thomson lacks specialized knowledge that would aid a jury to understand the evidence or to determine material facts because she is not a commercial premises security expert. CVS specifically asserts that Thomson's experience in residential property management and law enforcement is "immaterial to commercial premises security." (Doc. 72) at 2. Moreover, CVS asserts that Thomson is unfamiliar with commercial premises security as demonstrated by her lack of familiarity with industry standards.

Rule 702 uses a liberal definition of "expert." "[T]he expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'" Fed. R. Evid. 702 Advisory Committee's Note (1972). In other words, "the expert ... should not be required to satisfy an overly narrow test of his own qualifications." *Gardner v. Gen. Motors*

9

*Corp.*, 507 F.2d 525, 528 (10th Cir. 1974) (internal quotation omitted). A witness may qualify as an expert under Rule 702 even if "the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.").

Applying the liberal definition of an expert, the Court determines that Thomson's experience with crime prevention on real property, whether as a residential property manager or as an APD police officer working with ARAPA and performing POPs, sufficiently qualifies her as an expert whose specialized knowledge would aid a jury to understand the evidence or to determine a fact in issue. The Court declines to decide whether Thomson is the best qualified expert or if she has a specialization the Court would consider most appropriate to this case.

### b. Whether Thomson Based her Opinions on Sufficient Facts or Data

CVS argues next that Thomson failed to base her opinions on sufficient facts or data because her report does not "refer to any studies, empirical data or industry sources." (Doc. 72) at 5. Thomson, however, attaches to her report a list of 28 APD case numbers and corresponding incident numbers for the three-year period prior to the May 1, 2014, shooting and carjacking incident. (Doc. 72-1) at 1. She also subsequently reviewed a "bigger data set." (Doc. 60-2) at 29.

In assessing the sufficiency of the facts and data relied upon by an expert witness, the Tenth Circuit instructs courts to use a quantitative, not a qualitative, analysis. *United States v. Lauder,* 409 F.3d 1254, 1264 n. 5 (10th Cir.2005) ("As noted in the Advisory Committee Notes to the 2000 Amendments, subpart (1)'s reference to 'sufficient facts or data' calls for a quantitative rather than qualitative analysis."). Put another way, courts do

not examine whether the facts obtained by the witness are themselves reliable—whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion. Rather, the inquiry examines only whether the witness obtained the amount of data that the methodology itself demands.

*United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008).

Here, Thomson based her opinions on more than 28 APD police service calls for the three-year period preceding the shooting and carjacking. That quantity of data is sufficient to establish a criminal history of the CVS store and parking lot. Whether that data is qualitatively reliable goes to the weight of Thomson's opinions, and not to the admissibility of those opinions. Thomson, therefore, meets the Rule 702 "sufficient facts or data" requirement.

### c. Whether Thomson Based her Report on Reliable Principles and Methods

CVS asserts that Thomson "did not employ any coherent methodology in reaching her conclusions." (Doc. 72) at 7. To determine whether an expert's testimony is reliable, the "court must 'assess the reasoning and methodology underlying the expert's opinion ....'" *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citation omitted). Typically, to consider whether a scientific opinion satisfies the reliability requirement under Rule 702 and *Daubert,* a court considers the following nonexclusive factors:

> (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community.

*Id.*

In the area of soft science, indicia of reliability can include "professional experience, education, training, and observations" rather than "research, theories and opinions...." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006). Even so, "[t]he expert must explain the methodologies and principles supporting the opinion." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). A Kansas court stated that

11

> [e]xpert opinions may be based on education, training and experience, combined with reliance on reports, depositions or other information related to the particular circumstances, but an expert must explain factually why and how he reached his conclusions. *Hilt v. SFC Inc.,* 170 F.R.D. 182, 185 (D.Kan.1997). The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."

*Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 461 (D. Kan. 2004) (citation omitted).

Furthermore,

> neither *Daubert* nor the Federal Rules of Evidence "require[ ] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." … "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (citation omitted).

The Third Circuit in a negligence case involving an assault in a parking lot held that a security expert failed to employ a reliable methodology. *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521 (3d Cir. 2008). While the expert's report identified purported security issues, the Third Circuit concluded that the expert failed "to identify the source of any industry standards, obligations or duties allegedly applicable to [the business] or provide the methodology he used to arrive at his opinions." *Id.* at 524.

In another parking lot assault case, a premises security expert opined, among other things, that: (1) the attack "was foreseeable because there was a prior 'pattern of crime' at the" store; (2) the store's "security measures and store design fell below the generally accepted standard of care;" and (3) the store could have prevented the crime at issue if it had implemented the security measures the expert recommended. *Birge ex rel. Mickens v. Dollar Gen. Corp.*, 2006 WL 5175758, at *1 (W.D. Tenn.). Although the expert based his foreseeability opinion on his prior training and experience, the expert did not cite any

> [p]ublications, studies, research, or other data that support his methodology in determining what constitutes a "pattern of crime," his opinion that there was a pattern of crime at the … store, or his opinion that the attack was foreseeable.

*Id.* at *11. The court found the expert's "methods and opinions cannot be tested or subjected to peer review, there are no known rates of error for the method or controlling standards, and there is no evidence that his methods are generally accepted in the industry." *Id.* In addition, "the proffered testimony was not developed from research independent of [the] litigation," and the expert had "not explained how his experience [led] to the conclusion reached…." *Id.* The court concluded that the expert's "inability to cite to any standards in the retail security industry to support his opinion renders [the expert's] testimony unreliable." *Id.* at *12. Finally, the court concluded, among other things, that the expert's "opinion that the attack would not have occurred if certain security measures had been in place amounts to pure speculation." *Id.* at *13.

In *Bethea v. Bristol Lodge Corp.*, a case discussed in *Birge ex rel. Mickens*, an expert in security for commercial properties, prepared a report citing various security deficiencies as contributing factors to a club's failure to prevent a murder in its parking lot. 2002 WL 31859434 (E.D. Pa.). When asked about whether studies supported the effectiveness of various security measures, the expert simply did not know of any studies and asserted it was "common sense" that the more security measures a business uses "the better protection you have." *Id.* at *5. The court in *Bethea* observed that the expert cited "no industry standard for his opinions on the requisite necessities for adequate security, nor does he provide any explanation that could be tested or subjected to peer review as to how he has reached these opinions." *Id.* The court, therefore, determined that the expert's testimony was inadmissible under Rule 702 for that reason and because the jury could use its own common sense. *Id.* at *5-6.

13

The above parking lot security cases inform the Court on whether Thomson had a reliable methodology upon which to base her opinions. In examining her report, the Court observes that Thomson does not cite any publications, studies, research, or industry standards. When given an opportunity to explain her methodology at her deposition, Thomson likewise did not cite any publications, studies, research, or industry standards to support her opinion of the "dangerous condition" of the parking lot or to show the efficacy of some of the proposed security measures. Furthermore, Thomson did not explain either in her report or at her deposition how she determined from APD CAD data that the parking lot created a "dangerous condition," i.e, Thomson did not explain how she analyzed that raw data. Simply put, Thomson neither explained how or why she reached her opinions nor provided a methodology that can be tested or subjected to peer review.

In addition, Thomson's methodology included crime data related to incidents both within and outside the store. Except for making a conclusory and unsupported statement in her deposition that violent crimes are related to shoplifting, Thomson fails to explain how or why crime data associated with the interior of a store necessarily predicts the dangerousness of a parking lot. Accordingly, an analytical gap exists between the nature of the data that Thomson incorporated in her methodology and the opinions she offers. This analytic gap renders Thomson's opinions speculative in nature.

For the foregoing reasons, the Court concludes that Thomson did not employ a reliable methodology as required by Rule 702 and *Daubert*. Consequently, Thomson cannot testify as an expert in this case and the Court need not decide CVS' argument that Thomson did not apply her principles and methods reliably to the facts of this case.

*C. Conclusion*

The Court does not consider Thomson's August 24, 2018, affidavit because it, in effect, is an untimely second expert report. Examining Thomson's report and deposition excerpts, the Court determines that although Thomson is qualified as a crime prevention expert and she premised her report on a sufficient quantity of data, Thomson did not employ a reliable methodology to analyze that data. Plaintiff has failed to carry his burden of demonstrating by a preponderance of the evidence the admissibility of Thomson's expert testimony under Rule 702 and *Daubert*. Hence, the Court grants the Motion to Strike (Doc. 60) and excludes Thomson as an expert in this case.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE